LAMAR WEISENBORN, RESPONDENT, v. JAMES R. RUTLEDGE AND WILLIAM T. RUTLEDGE, AS EXECUTORS OF THE ESTATE OF B. P. RUTLEDGE, DECEASED, APPELLANTS. —121 S. W. (2d) 309.

Kansas City Court of Appeals. November 7, 1938.

*H. A. Wright, Waldo Edwards* and *Drain & Osburn* for appellants.

*William Vancleve* and *Fred C. Bollow* for respondent.

466

SHAIN, P. J.—This action was commenced by the respondent, plaintiff below, filing a demand in the Probate Court of Shelby County, Missouri, on the 8th day of June, 1936, for alleged services and attendance upon B. P. Rutledge, deceased, from September 29, 1933, to time of the death of said Rutledge. The amount claimed in the demand was $2250.

The cause was submitted to a jury in the probate court and verdict was for full amount of the demand.

Thereafter the demand was allowed by the probate court and assigned to the 5th class.

Thereafter an appeal was duly taken to the Circuit Court of Shelby County, Missouri.

Thereafter a change of venue was taken and cause was transferred to the Circuit Court of Macon County, Missouri.

Thereafter, and at the October term of the Circuit Court of Macon County, Missouri, at La Platta, trial was had before the court, jury being waived.

At the close of the evidence defendants offered a demurrer to the evidence and same was refused and objections made and exceptions taken.

Thereafter, and on October 21, 1937, the court, after having under advisement, found issues for plaintiff and rendered judgment for plaintiff in the total sum of $1275.

Thereafter, and in due time, the defendants duly appealed.

The defendants assign three errors as follows:

"1st:

"The Court erred in refusing to grant the demurrer filed by defendants at the close of the evidence for plaintiff and also in refusing the demurrer offered by defendants at the close of all the evidence in the case.

"2nd:

"The Court erred in admitting the evidence of the witness Phil Karcher as to the value of the services alleged to have been rendered by plaintiff to B. P. Rutledge in his lifetime.

"3rd:

"Because the judgment is excessive and is not supported by the evidence."

We will continue to refer to respondent as plaintiff and to appellants as defendants.

### OPINION.

As the trial below was before the court without a jury, we must follow the well-established rule and sustain the action of the trial court if same can be done upon any theory consistent with the law and the evidence. In doing this we are bound by all findings of fact made by the trial court if same be supported by any substantial evidence.

In support of the first assignment the following reasons are given, to-wit:

"All of the evidence shows that the plaintiff was a member of the family of B. P. Rutledge from the 29th day of September, 1933, to the death of said B. P. Rutledge.

"There was no evidence that plaintiff intended to charge, or B. P. Rutledge intended to pay, for any services that might have been rendered."

If the record sustains the defendants' contention as stated above, the law is plain and unequivocal respecting the matter.

As to members of the family, the law raises the presumption that services are voluntary and gratuitous and will prevail unless a contract to pay for such services be shown.

We need cite only Patrick v. Crank, 110 S. W. (2d) 381.

The trial court evidently found as a matter of fact that the plaintiff was not in the Rutledge home rendering services as a member of the family. We, of course, must examine the record to see if there is any substantial evidence that supports such finding.

Part of the evidence appears in narrative form and part by question and answer. We further note that some of the evidence that is in narrative form is not in the language of the witness but consists merely in the narrators conclusions as to what the witness testified. However, the evidence properly submitted in the record is sufficient to enable the court to determine as to issue presented by the defendants' demurrer.

The evidence discloses that the plaintiff herein is a grandson of the wife of B. P. Rutledge, and that his grandmother departed this life approximately two years prior to the death of B. P. Rutledge. It is further shown that plaintiff's father was a child of the wife of B. P. Rutledge by a former marriage, and, therefore, there was no blood relationship existing between the plaintiff and B. P. Rutledge, deceased.

While there is evidence that the plaintiff herein frequently stayed at the home of his step-grandfather and his grandmother, still there is evidence *pro* and *con* as to whether he was a member of the family.

Paul Boling, an uncle of plaintiff, and called by plaintiff, testified as follows:

"Lamar Weisenborn was working for me at the time Mrs. Rutledge died. I do not recall how long he had been working for me at the time of her death but he had been working there off and on for several years. When he worked for me he took his meals and slept in my home and when he was through I paid him off. After his grandmother's death I think he quit working for me. After her death I saw him in the Bal Rutledge home several times. I visited my sister, and Mr. Rutledge on several occasions and occasionally saw Lamar in the home.

"Q. Did you see Lamar there in the home? A. Occasionally.

"Q. Do you know what he was doing? A. Well, not particularly. He stayed around there, that is all."

A Mr. Riley, called by plaintiff, testified as follows:

"Lamar stayed at Mr. Rutledge's from September 1933 until the time of Mr. Rutledge's death in March, 1936. I went to Mr. Rutledge's home one day to get Lamar to work for me. Mr. Rutledge came to the door and I told him I wanted to get Lamar to finish the plowing which he had been doing for me, and Mr. Rutledge told me Lamar couldn't go; and I said, 'he can't go and finish plowing?' and he said, 'No, he can't go at all.' He said I couldn't see Lamar. I said, 'Is he here?' He said, 'Yes, but I couldn't see him.' I told him to tell Lamar to go finish that plowing or pull that tractor out of the way, and he said, 'He can't come out this evening, I am going to use him this evening.'

"I went there and had such a conversation with Rutledge two or three times.

### "CROSS-EXAMINATION

"Mr. Rutledge said he needed Lamar that evening. He didn't say what he wanted with him. I suppose he wanted him to drive the car.

"Q. That had been Lamar's home for a long time, hadn't it? A. I say not, I don't think.

"I don't think Lamar was taken into the Rutledge home when he was five or six years old. He stayed there awhile after his grandmother died. He stayed at my house when he plowed. He was not taken into the Rutledge home after his own mother died; he stayed with his father whose place joined my place. I don't know when he was taken into the Rutledge home; after his grandmother died he stayed there all the time.

"Q. Didn't he stay there a long time before his grandmother died? A. Not to my knowledge.

"Q. Did he go back and forth from there? A. He and his father lived adjoining my place, he used to go to school and stop and talk to me.

"Q. Who were the members of the Rutledge family, if you know? A. Well, Mr. Rutledge and Mrs. Rutledge.

"Q. Wasn't Lamar in the family too? A. Part of the time he was there.

"Q. Then the household consisted of Mr. and Mrs. Rutledge and Lamar Weisenborn, didn't it? A. He was there part of the time, part of the time he stayed at my house and his uncle George Weisenborn's and part with his dad.

"Q. Didn't he keep his clothes there and all that. A. I don't know."

Lonnie Mastin, called by plaintiff, testified as to plaintiff's residence as follows:

"During the early years of plaintiff's life he lived with his father, William Weisenborn. 'I have known him 15 or 16 years, and prior to September, 1938, he made his home with his father.' "

The trial court and not the appellate court having the duty to determine the fact, it becomes our duty to ascertain whether or not there is any substantial evidence to support the finding made by the trial court and, if so, we must disregard evidence favorable to the losing party in the trial below.

We conclude that the evidence set forth above presents substantial evidence from which a trier of fact can conclude that the plaintiff herein was not a member of the family of B. P. Rutledge and wife at the time of the death of Mrs. Rutledge.

In passing upon claim of error, in refusing the peremptory instruction offered by defendant, there is other evidence in the record that must be considered.

George Weisenborn, who is an uncle of plaintiff, was called as a witness for plaintiff and testified as follows:

"Q. Were you there at the Rutledge home at the time of her funeral? A. Yes, sir.

"Q. Did you hear any conversation between Lamar and Uncle Bal relative to Lamar staying there on that day? A. Not until after she was buried.

"Q. Along on the day of the funeral? A. Yes, sir.

"Q. Now you may tell the Court what Uncle Bal said to Lamar at that time? A. He said he wanted him to stay there and take care of him, that is all he said.

"Q. What did Lamar say? A. Well he said he would.

"Q. Just what did Rutledge say now? A. He said, —I want Lamar to stay with me and he said he will be well paid for it.

"Q. Did Lamar stay with him? A. Yes, sir he stayed with him.

"Q. Did Rutledge ever hold any other conversation with you at any other time or place after that, relative to Lamar staying there? A. Just once. Up town he said—you see so the boy stays there with me.

"Q. He said for you to see that the boy stayed there with him? A. Yes, talk to him, that is what he meant."

On cross-examination of the above witness the following questions and answers are shown:

"Q. You talked about some little oil stove. Now what brought up this conversation about Lamar?

"Q. He said he wanted Lamar to stay with him.

"Q. He said that again? A. Yes, sir.

"Q. That is a month afterwards? A. Yes, sir.

"Q. Now let's get what he said, let's get it exactly what he said to you? A. He said—I want you to see that that boy stays with me.

"Q. What else did he say? A. He said—he will be well paid for it, if he does.

"Q. Lamar wasn't there? A. No, not at that time he wasn't.

"Q. He didn't say anything about paying Lamar down at the house did he, in that conversation after the funeral? A. No, I don't know as he did."

On redirect examination the above witness testified that he told plaintiff what B. P. Rutledge said.

We conclude that the evidence herein above set forth presents substantial testimony of such a character as makes an issue of fact as to whether or not plaintiff was a member of the family prior to the death of his grandmother and as to whether or not his services after that event were to be gratuitous, and, therefore, conclude we are not justified in convicting the trial court of error in refusing the peremptory instruction.

As to defendants' contention of error in admission of the testimony of Phil Karcher, we have carefully studied the transcript of this witness's testimony and conclude that the court's remarks made in refusing to strike are borne out by the record.

The remarks of the court as to Karcher's testimony are as follows:

"THE COURT: Well, the testimony is rather vague but I think taking it all the Court can ascertain a reasonable clear view of what the witness intends to say. I think he has shown familiarity with the reasonable charges down there so I think it is competent and the objection will be overruled."

In direct examination of Karcher the following proceedings are shown:

"Q. Your name is Phil Karcher. A. Yes sir.

"Q. You have lived in Clarence a number of years. A. 24 years 13th of last September.

"Q. Mr. Karcher, are you familiar with the price usually charged for the type of work that has been testified to here—waiting on people in the community of Clarence?

"MR. EDWARDS: We object to his saying whether he is or not. That is a question for the Court to pass on.

"MR. BOLLOW: I asked him if he knew the prevailing wage in the community.

"THE COURT: Read the question? (Question read to the court by the reporter.) A. Why, yes, sir.

"THE COURT: Overruled.

"To which ruling of the court the defendant by and through counsel, duly objected and excepted at the time and still excepts.

"Q. What is the prevailing wage or charge? A. Oh, from $2 to $3 is what I get for it.

"Q. Per day? A. Per day.

"MR. EDWARDS: We object and ask it be stricken. He is basing it on what he got for it.

"THE COURT: Yes, I think that be stricken.

"MR. BOLLOW: The latter portion of his answer?

"THE COURT: Yes."

At the close of the direct examination of the witness the following appears:

"MR. BOLLOW: I have asked him that and he testified he is familiar with it.

"Q. Now not what you get, Mr. Karcher, but just what is the reasonable and average charge for that type of work in that community? A. About what I said; around there.

"Q. About what you got is the reasonable charge? A. Yes, sir. "That is all."

The record shows no objections or exceptions to the above two questions and answers.

On cross-examination of Karcher the following questions and answers appear:

"Q. Just what kind of work do you say is worth $2.00 a day, what do you mean? A. When you take care of the patient.

"Q. What kind of patients? A. Whoever he may be.

"Q. And whatever he may be suffering from? A. Yes, sir."

It is evident that the witness is not an expert. However, it is shown that he had some experience in attendance upon the sick in that community, and we cannot say that his testimony had no probative value. It is the settled policy in this state that when a jury is waived there is much liberality in admission of evidence. [Heart of America Lumber Co. v. Wyatt Lumber Co., 227 Mo. App. 794, 59 S. W. (2d) 800; Nevil v. Wahl, 228 Mo. App. 49, 65 S. W. (2d) 123.]

In the determination of defendant's second assignment of error, we give consideration of the court's statement, *supra*, and conclude in view of what was said by this court in Gregar v. Auto Laundry Co., 83 S. W. (2d) 142, and in view of the rule as decided by the St. Louis Court of Appeals in Louis v. Frankle, 158 Mo. App. 262, we conclude that defendants' claim of error No. 2 is not well taken.

Touching the value of services of the nature herein in issue, this court in Schrum v. Brill, 230 S. W. 367, l. c. 368, said:

"When the services and their nature are shown, along with their reasonable value in the community in which they were rendered, the jury can, from their experience as men in the ordinary affairs of every day life, form a pretty fair estimate as to the reasonable compensation to be allowed therefor. Of course, in such inquiries, the question is not what a witness himself would demand before performing such duties, but only what such services would be reasonable worth in such community."

There is evidence to the effect that plaintiff did work for Mr.

Rutledge of a very menial nature. Further, there is evidence of expressions by Mr. Rutledge as to services being satisfactory.

Wm. Thompson testified as follows:

"I live near Clarence and knew Bal Rutledge since 1880; I was a close friend and neighbor of Rutledge, and have done business with him. I have visited in the Rutledge home since the death of Mrs. Rutledge, and saw Lamar there. I have seen Lamar in the Rutledge home cooking and serving meals for Rutledge, keeping up the fires and doing what ordinarily would be done around the house. He seemed to be doing what ever Rutledge wanted him to do. I quite often dropped in there after he got poorly and saw him a few minutes. At one time he had a woman there from Shelbyville and I noticed in a little while she was gone and nobody there but Rutledge and Lamar. Later on he had a woman there from somewhere about Woodville for a short time and then she was gone, and I said to Bal, 'Bal, what become of your housekeeper, the woman,' then he said 'I will tell you, Lamar and me naturally get along better without them than we do with them.' That is just what he told me. After that I never saw a woman there. I think Lamar made his home there after Mrs. Rutledge died, his grandmother."

A Mr. Todd testified as follows:

"Q. Tell me what, if anything, Uncle Bal told you about Lamar staying there and the arrangements he had? A. He took me through his rooms and showed me what a nice housekeeper Lamar was, he could get along without any woman, and wanted to know if it wasn't as clean as any woman could do it, and it was all right, that was at the first, maybe after she had been dead a month or two, no one else there but Lamar and said he didn't need anyone else, him and Lamar could get along, he was so good to wait on him and take care of the house."

The defendants make claim that judgment is excessive.

There is substantial evidence that the plaintiff was not in constant employment in the home and that during the time covered by his claim he frequently had other employment.

The trial judge was in a much better position to determine the question here presented than is this court. The record shows that the question of excessive verdict was presented to the court on motion for new trial and the trial court refused to sustain defendants' contention.

In passing upon this question, we feel justified in taking into consideration the showing of the whole record.

When presented to a jury in the Probate Court of Shelby County a verdict was given for $2250.

Evidently the trial court found something in the evidence that he felt justified a reduction. We conclude that it is reasonable to pre-

sume that the trial court in declaring judgment for a total amount of $1275 took into consideration all of the facts and circumstances in evidence including the facts concerning the outside employment testified to.

We conclude that there is not shown error in the record that would justify a reversal of the judgment.

Judgment affirmed. All concur.